**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 23-CR-209-1 (CKK)** |
| | ) | |
| **NICHOLAS FULLER** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**DEFENDANT NICHOLAS FULLER'S**
**MEMORANDUM IN AID OF SENTENCING**

## I.    Introduction

Mr. Fuller will be before the Court having pleaded guilty to one Count of Civil Disorder in violation of 18 U.S.C. § 231(a)(3) on Capitol grounds on January 6th, 2021. He is remorseful for his conduct and is prepared to accept responsibility for his actions. Mr. Fuller, through counsel, respectfully requests a non-custodial sentence with any special conditions the Court sees fit to impose, along with the $2,000 restitution obligation. Such a sentence is sufficient but not greater than necessary to meet the goals of sentencing, as required by 18 U.S.C.§ 3553(a). The United States Probation Office also recommends a non-custodial sentence. Probation specifically recommends 36 months of probation and a $2000 fine with the added component of home detention. Counsel agrees that in light of the circumstances of this case and Mr. Fuller's extraordinary family circumstances, this would be a reasonable sentence.

1

## II.    Procedural History

Mr. Fuller was arrested at work in Waseca, Minnesota on June 14, 2023, pursuant to a criminal complaint. His nephew and co-defendant, Caleb Fuller, was also arrested that day and his brother and co-defendant Kenneth Fuller was arrested two days later on identical charges. On June 29, 2023, an information was filed charging them with misdemeanors. All three made their initial appearances in this District via video on July 6, 2023.  Mr. Nicholas Fuller indicated a desire to plead guilty to the misdemeanor charges early on. However, the only plea offer the government was willing to extend was to a felony that he had not been indicated on. Nevertheless, Mr. Fuller remained willing to plead guilty even to the as yet uncharged felony. On March 13, 2024, a superseding indictment was issued to include the additional charge in violation of 18 U.S.C.§ 231. Mr. Fuller pleaded guilty to that charge. The government did not seek pretrial detention.

Mr. Fuller has from the beginning acknowledged the wrongfulness of his conduct and has expressed a desire to plead guilty. The Court may recall that we advised that Mr. Fuller was intending to plead guilty at several status conferences and that the delays in entering the plea were caused by the government, not Mr. Fuller. Counsel for Mr. Fuller was seeking a plea offer from the government and sought only one substantive change in the offer made by the government. He agreed that he would take a plea to the felony 231 charge. The only sticking point was that the government was insisting that Mr. Fuller agree that 4C1.1 (zero-point offender) did not apply. Counsel could not agree to that since many judges in this Court had already ruled that it did apply under these circumstances, and counsel had obtained

the concession that we could ask the Court to apply it in another plea offer at *the very same time*. Once the government was able to present Mr. Fuller with a plea agreement that Counsel did not believe was inconsistent with the law, Mr. Fuller quickly agreed. And, on June 20, 2024, Mr. Fuller entered a guilty plea to Count 1 charging him with Civil Disorder in violation of § 231(a)(3).[1] Mr. Fuller's co-defendants chose not to plead guilty, as is their right, and are scheduled to appear before this court for a jury trial on January 1, 2025.

On June 20, 2024, immediately following his guilty plea, Mr. Fuller willingly met with the prosecution and the FBI for an interview in which he was fully transparent about his actions at the Capitol, made no excuses for his behavior, and expressed genuine contrition. No suggestion was made that he was in anyway not truthful. Mr. Fuller has been compliant with the conditions of his release. His cooperation and demeanor have been positively noted in both the PSR and the recommendation by the US Probation Office.

> *The defendant has been compliant with the terms of his pretrial release and was described by his supervising officer to have a very positive attitude.*

PSR ¶ 21.

### III.   Application of the Sentencing Factors

#### A. History and Characteristics
##### 1. Background and Family

---

[1] To be clear, counsel is not suggesting government counsel did anything wrong, but rather includes this information to explain why what should have been a very early plea was delayed.

Nicholas John Fuller, now age 41, was born in Mankato, Minnesota as one of four children to Kenneth and Linda Fuller. His father, a custodial engineer, retired after suffering a variety of heart problems. His mother, who worked as a computer programmer during Nicholas's childhood, retired in the 1990s after being diagnosed with chronic fatigue syndrome. For most of Nicholas's teenage years, she was confined to a wheelchair but has since improved enough to walk independently and now acts as the full-time caregiver for Nicholas's father.

Nicholas faced numerous challenges during his childhood. He struggled academically and had a strained relationship with his father, who was controlling and abusive. Nicholas often rebelled against his father's constraints, leading him to frequently runaway from home. He began using methamphetamines when he was only 13 years old and dropped out of school during his 9th grade year. The substance abuse and subsequent addiction were directly tied to multiple juvenile convictions which eventually landed him in prison where he served four years between the ages of 18 and 22.

During his imprisonment, Nicholas underwent a profound transformation. Looking back, he reflects on his sentence as one of the greatest blessings in his life. While incarcerated, he earned his GED, received his C-TECH degree, regained his faith, and most importantly completed the TRIAD program which helped him overcome his drug addiction. Upon his release, Nicholas was educated, skilled, and clean from drugs. He immediately obtained work in the construction field. Driven by a sense of duty to give back to society, Nicholas began volunteering as a speaker

4

at Boy Scout conventions where he shared his story and his past struggles.  He then began volunteering at Royal Family Kids Camp [RFKC], a camp for neglected and abused children, most of whom have been in foster care.[2]

In 2006, when Nicholas was 23, he met his now wife, Emily, at RFKC where they were both volunteering during the same week of camp.  Their connection was instant, fueled by their mutual dedication to faith and helping others.  The two were married a year later and have enjoyed a loving and supportive marriage ever since. They have six children together: two boys and four girls - ages 5, 8, 10, 14, 15, and 16. Nicholas considers their children to be his greatest accomplishments.  All six children excel in school and are involved in multiple extracurriculars.

### 2.  Employment and Work Ethic

Nicholas is a hard worker with a strong work ethic. He has consistently been employed since the week after he was released from prison nearly twenty years ago in 2005.  After working several years in the construction field, Nicholas obtained employment at Nielsen Blacktopping in 2013. He started out as a laborer/truck driver earning $17/hour and eventually earned a Class A driver's license which allowed him to advance within the company, acquiring several promotions to become a road construction equipment operator earning $39/hour.  Nicholas currently works 50-60 hours per week with a typical schedule of 6am to 6pm. During the winter months when Minnesota weather impacts road conditions, it's

---

[2] Royal Family Kids Camp (Ages 7-11) - Love Fosters Hope

not uncommon for him to work up to 70 hours or more per week. His employer and a coworker have both written in support of him. (See Exhibit 1, Letters).

### 3. Church and Community Involvement

Despite working long hours and being the sole financial provider for eight people while also parenting six children with Emily, Nicholas remains committed to his community.  Besides attending church every Sunday with his family, he dedicates his Wednesday nights to volunteering there, where he leads group activities, games, and sports for children. (See Exhibit 1, Letter from Megan Gilbertson).

Nicholas has also taken on the role of mentor to a formerly incarcerated individual at a local group home. He offers support and guidance whenever needed and makes visits as often as his schedule permits. Nicholas believes his past experiences make him a good candidate to help others who have faced similar challenges, and he is determined to transform adversity into positive change.

Although his busy schedule has prevented him from continuing volunteer work at RFKC [now known as RFK], Emily has recently resumed her volunteer work there. Nicholas supports her by taking on all parenting responsibilities during her absences, and he hopes to return to RFK as a volunteer himself again one day.

Mr. Fuller has shared with counsel that he believes he was given a second chance in life following his juvenile convictions and his rehabilitation. He truly believes it is his duty to "give back," not just by raising his own children to be exemplary citizens, but also by doing his part to have a positive impact on society. This is not something that has been done to impress or draw sympathy from the

Court. Indeed, Nicholas has been striving in these endeavors since his release from prison in 2005, and will continue to do so, regardless of the sentence imposed in this case.

### 4. Criminal History, Mental Health and Substance Use

Mr. Fuller is a zero-point offender, and for good reason. Although he has prior convictions, most of them were juvenile offenses linked to his childhood struggles with drug addiction, and all are very dated. These convictions should not influence his current sentencing, a sentiment reflected in the recommendation by the US Probation Office:

> *The defendant has a notable criminal history, specifically as it relates to illegal substance use, with which he has struggled. However, the criminal history is dated, and it does appear that the defendant has made notable strides since his last conviction in 2009...*

ECF 68, Probation Recommendation.

Mr. Fuller has taken responsibility for his mental health by seeking counseling as an adult where he has reflected on his past and his difficult upbringing. In February of 2023, Mr. Fuller was advised by his therapist to use marijuana to treat anxiety (which is confirmed by medical records and noted in the PSR at ¶99).  Despite this recommendation, he stopped using marijuana following his arrest to comply with the conditions of his release, though he did use it on one occasion after that, which he openly admitted during his PSR interview. Mr. Fuller very rarely consumes alcohol, and when he does it's nothing more than an occasional beer.  The Government implies that Mr. Fuller used methamphetamines up until 2018, but this is simply not true. Mr. Fuller overcame his drug addiction

while incarcerated over 20 years ago.  He had a one-time slip up in 2018 – which he was fully transparent about while speaking to the United States Probation Officer. Mr. Fuller regretted the decision within moments of the substance entering his body and has no intention or desire to ever use it again.

### B. The Nature and Circumstance of the Offense

#### 1. Planning for January 6th

Like many others who traveled to Washington D.C. to attend the Trump rally, Mr. Fuller did so because he believed there were irregularities in the election which is what he had been hearing on the news and in his community. He wanted to support Trump by showing up to the rally. He also wanted to visit the city and see the sights which is something he had never had an opportunity to do before. There was no intention of visiting the capitol building (aside from to take photographs of the building along with the many other historical buildings and monuments in the city).

The trip was a spontaneous decision. Aside from his co-defendant family members with whom he planned the trip, Mr. Fuller did not coordinate with any other groups, nor did he post anything about the upcoming rally on social media. He is not associated with any extremist groups, or even with any online political groups.  Mr. Fuller had never been to Washington D.C. before, nor had he ever attended a rally or protest of any kind.  In fact, he had rarely left his own state and the last time he had traveled for anything outside of work was in 2012 when he took his wife and children to visit extended family in Georgia.

Mr. Fuller used part of his stimulus check to fund the trip to Washington D.C., though to be clear, he spent very little money on the trip. The main expenses were gas and food.  He and his brother and nephew had planned to sleep in their vehicle to avoid costly lodging expenses. They drove from Mapleton, Minnesota to Washington D.C. on January 5th.  Shortly after they arrived, they were offered a free hotel room by a stranger who noticed them giving food to a homeless man.

The government implies that Mr. Fuller had a plan to commit crimes in D.C., and that he left his family behind to do it.  They state the following:

> *"Nevertheless, he traveled to Washington, D.C. to commit these crimes leaving his family behind. Fuller committed the crime because he chose to place his opposition to the government above all over concerns, including the law and his own family."*

Govt. Sentencing Memo at 16. This statement is unfair and highly misleading. Mr. Fuller never intended to commit any crimes in the District.  Nor did he "leave his family behind" or put "his opposition for the government" ahead of his family. Mr. Fuller drove to Washington D.C. with his brother and nephew to attend a rally where they planned to sleep in their vehicle to save money and be away from home for less than 36 hours.  Of course he wasn't going to bring six children somewhere to sleep in a car. In fact, unlike others who brought their children into the Capitol that day, Mr. Fuller did the responsible thing and did not bring his children even to the rally. One can only imagine what the government would have said if he had brought his six children with him to the Capitol that day. Obviously, he regrets that he decided to come and even more importantly that he went to the Capitol grounds and

acted in the manner he did. And he regrets that those actions have placed his family in jeopardy, but that was not his intention.

### 2. Actions on January 6th

In many other January 6th cases, defendants are generally grouped into two categories regarding their arrival to capitol grounds: those who left the rally early and either witnessed or participated in the initial breaches at or before 1 p.m.; and those who left the rally after Trump's speech ended at 1:10 p.m. and arrived with the massive crowd between 1:30 p.m. and 2:30 p.m. Even people arriving as late as 2:40 p.m. would have been able to watch from the lawn as the crowd made the final push to overtake the lower and upper west terraces while police retreated. Mr. Fuller was not in either of those categories. He arrived at 2:59 p.m., after the lower west terrace was completely overtaken, after the crowd had flooded the building, and after the upper west terrace had then been generally re-secured by law enforcement.

Similarly, in many other January 6th cases, the government highlights the level of violence and/or chaos that each defendant witnessed before deciding to stay, participate, or continue moving forward undeterred. But this factor is also not applicable to Mr. Fuller in the way it is to most others. When he arrived on Capitol grounds, there was nothing to see from the ground on the west front aside from a giant crowd of people.

<u>Prior to arriving on capitol grounds</u>:

Mr. Fuller attended the rally at the Ellipse where he listened to the speeches. He wore regular civilian clothing and did not bring weapons of any kind – real or makeshift. He did not carry flags. After Donald Trump finished speaking, thousands of people walked east toward the Capitol. Mr. Fuller and his co-defendants did not follow them.  Instead, they went the opposite direction. They walked to the Lincoln Memorial where Mr. Fuller took photographs of his brother and his nephew.



Meanwhile, at the capitol and while the Fullers were still sightseeing, the crowd eventually overtook the west front. Mr. Fuller was not there to witness the following progression:



*Alternate angles of the west front crowd progression prior to the Fullers' arrival:*

  

By 2:53pm, and still prior to Mr. Fuller's arrival, law enforcement had retreated and formed new lines across the upper west terrace. These lines remained stationary after this point. When the police lines later did move, they only moved forward, pushing people out.

*Image below shows aerial view at 2:53pm with red lines showing law enforcement's positions on the upper west terrace.*



Anyone arriving to Capitol grounds after 2:53pm understandably may have assumed that the police lines had originated on the upper west terrace. And when Mr. Fuller arrived, it was indeed his understanding that the line represented the "restricted perimeter." This does not in any way excuse his disorderly conduct and his impeding of the Officers who were trying to clear the area.

<u>Actions at the Capitol:</u>

At 2:59 p.m., Mr. Fuller entered capitol grounds at Garfield Circle.

*Image below taken from surveillance video at Garfield Circle at 2:59 p.m. Note that the visible fencing is surrounding the actual monument and the grass (these particular barricades were to protect the monument and were not blocking entry to capitol grounds)]. Right side image shows the west front at this same time with red circle showing Mr. Fuller's general location.*



Mr. Fuller eventually walked up the SW staircase. He walked directly from the ground level to the upper west terrace using the staircase and therefore did not travel anywhere on the lower west terrace where the "tunnel fight" was taking place – another incident he never witnessed.

When he arrived at the top of the SW stairs, he saw a group of law enforcement standing calmly in a line behind a row of bike racks; and a group of protestors standing generally peacefully in front of that line. This was the first time that Mr. Fuller had seen any law enforcement officers on January 6th.  Officers were clearly standing in a line to prevent the crowd from advancing. Mr. Fuller stopped short of the line and joined the crowd by standing a few steps down.



At the time, Mr. Fuller did not appreciate that many of these MPD officers were the same offices who had earlier been outnumbered and overrun by protestors. He didn't know that many of them had retreated up the very same steps he had just climbed, nor did he know that some of them had been violently assaulted on the west front. He knew, from speaking to others, that some people had entered the building, but he assumed it was a small group of unruly individuals.

For the next 29 minutes, Mr. Fuller stood in this same location. At times, some people in the crowd around him made derogatory remarks toward the officers, but Mr. Fuller was not a part of that. He remained mostly quiet, occasionally chatting with those around him or taking photos using his phone.

At one point, Mr. Fuller assisted law enforcement by removing a potential weapon from the crowd -- at 3:44pm, after a nearby protestor set a metal pole on the ground, Mr. Fuller picked it up and gave it to law enforcement by first alerting them and then carefully sliding it under the bike racks.



Just after he slid the pole to officers, another protestor admonished him for assisting law enforcement, shouting, "What are you fucking retards doing?... Don't give them that shit!"  Mr. Fuller responded to the man by saying, "Why, so you can go to jail?"  He then joked with the officers that it was his own fingerprints that

were now on the pole.



  At 3:55pm, the Fullers left the area and walked north along the upper terrace, passing underneath the bleachers. They were not stopped from wandering by law enforcement.  On their way, Mr. Fuller's brother Ken assisted officers by handing them a large bike rack that had been lying on its side on the steps.



Mr. Fuller never approached the officers in this area.

*Image below is at 4:06pm which is the closest that Mr. Fuller (orange circle) came to law enforcement in this area.*



The Fullers eventually left the area underneath the bleachers and came out on the opposite side from where they entered.  When they emerged, they were on the upper terrace just above the northwest steps.  Here they found a similar scenario as they had seen on the southwest steps… a stationary line of law enforcement and a crowd of people.  However, both the crowd and police presence were significantly larger on this side.  Again, Mr. Fuller assumed this line of officers had been standing here in this spot for the entire day.  He was unaware that this group of officers (mostly Arlington County PD and Montgomery PD) had recently arrived as backup to assist MPD in clearing the terrace.

At this point, Mr. Fuller made the foolish decision to stand at the front line of officers, and later resisted when the officers began clearing the terrace. But it's important to note that when Mr. Fuller approached the line, he did not do so aggressively. He had no intention of pushing or breaching the line and he certainly

didn't want to get past the line so that he could go inside the building.  To put it simply, Mr. Fuller's intentions were to participate by standing there as a body in the crowd.

Mr. Fuller stood at the line in front of Arlington County Police Officer J.M. The government points out that he jostled with Officer J.M.'s shield at one point. This is accurate and Mr. Fuller does not deny it. However the screenshot used as evidence by the government implies that this was forceful, which it was not. Mr. Fuller was chatting with and smiling at Officer J.M. when he put his hands on the shield. Ofc. J.M. gently pushed the shield a few inches forward, and Mr. Fuller gently pushed it back. The two did a little back and forth like this and that was the end of it. This interaction was non-aggressive and non-threatening, albeit a stupid thing to do.



The government accurately points out that Mr. Fuller stood within full view of the police line, alternately praying, chanting, and using his phone to take photographs or video. It should be noted that during this time, none of the officers told him to leave or that he shouldn't be there. Furthermore, his demeanor was peaceful and friendly. Of course this does not absolve him of his crime, but it differentiates him from so many others around him who were verbally harassing the officers, calling them cowards, traitors, and worse. At one point, Mr. Fuller took a selfie with Officer J.M.





When he smiled and laughed and took selfies with the officers, he was not mocking them. Mr. Fuller holds the police in high regard and he found them to be impressive. Of course the officers may not have been equally impressed with Mr. Fuller, but they did not seem to be threatened by him individually either. He now recognizes that even when he was not acting aggressively, as a part of the larger mob, his actions indeed impeded the officers and made their job that day dangerous and nearly impossible to carryout. And for that, he is deeply sorry.

At 4:21 p.m., the officers indicated that they were preparing to push the crowd forward. Instead of moving, Mr. Fuller made the foolish and unlawful decision to remain where he was. The government summarizes the interaction as follows:

> At approximately 4:21 p.m., the police repeatedly ordered Fuller and other rioters to move back and began stepping towards the rioters while striking their riot shields on the ground. Rather than comply, Fuller initiated physical contact with the police line, actively resisting their enforcement efforts for over a full minute.

Govt. Sentencing Memo, at 2. This statement is generally accurate except for the implication that he initiated physical contact with law enforcement. He resisted their efforts to clear the area and by doing so, impeded law enforcement during a civil disorder. When Mr. Fuller realized that officers were getting ready to push, he kneeled down on the ground which obstructed their ability to clear the area.



Just moments before the officers pushed forward, Mr. Fuller – while still on his knees – turned his body to the side.

*Body camera footage from Ofc. A.G., noting that the hand on Mr. Fuller's shoulder belongs to the protestor next to him and not law enforcement.*



As the police moved forward, Mr. Fuller resisted by remaining in this position, and raising his arm and elbow, making contact with police officers and leaning his body against them when they pushed forward. While resisting the push, Mr. Fuller never put his hands on officers.  Although he did raise his arm and elbow while resisting the push, his hands were on other protestors.

*Images below show Mr. Fuller leaning into the man next to him and grasping that man's red sweatshirt.*





Finally, during the incident Mr. Fuller was being pushed from the other direction, not only by the crowd in general, but specifically by another protestor, which is evident in the image below (noting also that this protestor was actually pushing Mr. Fuller to the side and not directly against law enforcement):



The images above are included to provide the Court with additional angles – they are not intended to contest Mr. Fuller's guilt or to place blame on anyone else. Again, there is no dispute that he broke the law or that physical contact was made. But Mr. Fuller's role in this incident should be fully understood in consideration of his sentence, as well as in the application of the three-point physical contact enhancement. Mr. Fuller was not an assailant, and aside from the one minute during which he resisted police, he was peaceful. This is supported by Officer J.M.'s FBI interview following January 6th, in which he did not recall any specific altercations with individuals. Officer J.M, like Mr. Fuller, arrived late and didn't experience or witness the turmoil that had occurred prior to his arrival. The following includes Ofc. J.M.'s entire interview (noting that the wooden object striking his shield is unrelated to Mr. Fuller)[3]:

> ██████████ was part of a platoon of approximately 35-38 ACPD officers assigned to assist Metropolitan police department with crowd control on January 6, 2021. ██████████ did not remember any specific altercations with individuals. ██████████ did not remember specifically taking anyone into custody. The situation was hectic at times, things happened fast, and everyone was wearing face coverings. ██████████ recalled that during the day he was struck on his shield with a wooden object. ██████████ was unable to provide any further details and stated the strike did not result in an injury.

After the incident on the steps, and before leaving capitol grounds, Mr. Fuller returned to the police line - which he openly and honestly admitted to the FBI. He did not engage in any violence during that time. He left the steps and departed

---

[3] Interview obtained by defense in Global Discovery, [FBI-053-00633738]. Officer name was redacted by defense to protect the privacy of this officer.

capitol grounds when an officer specifically told his brother Ken that they should leave.

<u>After leaving capitol grounds:</u>

The Fullers drove back to Minnesota that same afternoon, immediately after leaving capitol grounds. Mr. Fuller learned the full extent of the rioting and violence that had occurred when he listened to the radio on the way home and later watched footage on the news. Although many January 6th defendants report similar experiences, claiming they "didn't know how bad it was" until they saw it on television, Mr. Fuller's account is more credible given his very late arrival time to Capitol grounds. Upon learning the full scope of the day, Mr. Fuller felt a great sense of shame, remorse, and embarrassment for having been a part of the day at all, and even more so for his specific actions.

### 3. Actions following January 6th

Mr. Fuller has demonstrated real remorse for his actions, and it is completely unfair to suggest that this remorse is not genuine or only came about because of his impending sentencing. He never suggested that what he had done was acceptable, he didn't claim that his actions were patriotic, and he didn't minimize what he had been involved in. He posted nothing on social media. He recognizes that January 6 was a dark day for the nation. Like many people, after he left Capitol grounds that day, he went about his normal life. Unlike many, he didn't post on social media bragging about his actions. He cooperated fully upon his subsequent arrest. Rather than become bitter or resentful or even proud of his actions that resulted in his arrest, he resolved to accept responsibility for what he had done and to face the

challenges that were before him as an adult and to set a good example for his

children. He was honest and forthcoming with the government and the FBI during

his interview and expressed his regret for participating in the events of the day, and

he truthfully acknowledged his wrongdoing as well as expressed remorse when he

spoke to the U.S. Probation Officer.

## IV.    Objections to the PSR

### A. Mr. Fuller qualifies for the "zero point offender" adjustment

Effective November 1, 2023, the United States Sentencing Commission

created a new guideline provision relating to criminal history at U.S.S.G. § 4C1.1,

Adjustment for Certain Zero-Point Offenders. Section 4C1.1 provides for a two-level

decrease from the offense level for defendants who did not receive any criminal

history points so long as they meet the following criteria:

1. the defendant did not receive any criminal history points from Chapter Four, Part A;
2. the defendant did not receive an adjustment under §3A1.4 (Terrorism);
3. the defendant did not use violence or credible threats of violence in connection with the offense;
4. the offense did not result in death or serious bodily injury;
5. the instant offense of conviction is not a sex offense;
6. the defendant did not personally cause substantial financial hardship;
7. the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
8. the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
9. the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and
10. the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

U.S.S.G. § 4C1.1(a); see also United States Sentencing Commission, Amendments to the Sentencing Guidelines (Apr. 27, 2023), at 87-88 (Part B, Subpart 1).

The Zero-Point Offender applies to Mr. Fuller. He has no criminal history points and none of the exceptions apply to his conduct. The government concedes that he has no criminal history points but opposes the two-level reduction because the government alleges that Mr. Fuller used violence or credible threats of violence in connection with the offense. He did not. While there was a tremendous amount of inexcusable violence that day, Mr. Fuller did not himself engage in violence or threaten violence. And that is what matters in assessing whether 4C1.1 applies.

The Sentencing Guidelines Manual itself does not define the term "use violence or credible threats of violence" within § 4C1.1 or its commentary. And when no definitions are provided, courts look to dictionary definitions to determine meaning. *See Kaufman v. Nielsen*, 896 F.3d 475, 485-87 (D.C. Cir. 2018). Courts in this district have issued several opinions discussing dictionary definitions of violence when considering § 4C1.1 and found that violence is "'[t]he use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent to harm'" or the "exertion of any physical force so as to injure or abuse." *Bauer*, 2024 WL 324234, at *2 (*quoting* Violence, Black's Law Dictionary (11th ed. 2019), and Violence, Webster's Third New International Dictionary (1993)); *see also United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) (similar); *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (D.D.C. Jan. 31, 2024) (similar). There is no evidence

that Mr. Fuller had any fury or vehemence, nor did he exert force as to injure or abuse or intended to injure or abuse.

Courts in this District to have addressed the issue have found that § 4C1.1(a)(3)'s violence exception requires the defendant to have *personally* used violence or made credible threats of violence to be disqualified; it is simply not enough that Mr. Fuller was part of a group where *others* engaged in violence or made credible threats of violence. *See, e.g.*, *Yang*, 2024 WL 519962, at *4 (rejecting the government's violence-by-presence theory of § 4C1.1(a)(3) after finding the "inquiry turns on the actions of the defendant himself or herself, not the actions of others," and "join[ing] the view of at least six other judges in this District," including Judges Kollar-Kotelly, McFadden, Friedrich, Mehta, Howell, and Boasberg). *See also*, *United States v. Joshua Doolin*, 21-CR-447-3 (CJN) Dkt. 313, adding Judge Nichols to the list of judges who concur and *United States v. Paul Orta*, 21-cr-146 (DLF) adding Judge Friedrich. (See Exh. 2, Transcript of *Orta* Sentencing).

Judge Bates' written opinion in *Yang* is instructive. (See Exh. 3). There, Mr. Yang "stood near the front of the crowd close to the police line" in the Rotunda. *Yang*, 2024 WL 519962, at *1. While Mr. Yang's "body language was generally nonconfrontational," he made "physical contact with officers twice." *Id.* First, "[w]hen a scuffle broke out nearby . . . Yang briefly grabbed an officer's wrist." *Id.* Second, "[w]hen an officer approached from the side and pushed [another rioter] firmly with a baton, Yang . . . briefly grabbed the baton as [the other rioter] fell

backward." *Id.*[4]

The government included the following still photographs in its sentencing

memorandum, ECF No. 34 at 11:



Image 8: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold
of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.



Image 9: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold
of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.

---

[4] According to the government's sentencing memorandum, "When police officers formed a line
to expel the rioters from the Rotunda, Yang refused to move back or to leave, and instead,
obstructed the officers. Yang pushed back and physically grabbed the arm of one officer, and
when another officer pushed Yang towards the exit, Yang confronted the officer and waved his
hand in his face instead of leaving. He remained near the advancing police line, and when an
officer used his baton to push another rioter back, Yang physically grabbed hold of that officer's
baton and interfered with the officer's attempt to clear the Rotunda. Yang finally exited the U.S.
Capitol building at approximately 3:15 p.m., having been inside for roughly 30 minutes." *Yang*,
No. 23-cr-100, ECF No. 34 at 2.

The government further represented that Mr. Yang "push[ed] back against the officers" and "remained at the front of the mob clashing with the officers," *id.* at 12:



Image 10: Still from Government Exhibit 1 Showing Yang Pushing Officers Working to Expel Rioters from the Rotunda at Approximately 3:08:56 p.m.

Judge Bates concluded that Mr. Yang's actions did not constitute "violence" within the meaning of § 4C1.1. *Yang*, 2024 WL 519962, at *4. Yang "stood near the front of the crowd close to the police line. While his body language was generally nonconfrontational, he made physical contact with officers twice." He grabbed a police officer's wrist and grabbed the baton of an officer as he was pushing another rioter away. The Court found that while Mr. Yang may have used physical force in that "he briefly made physical contact with two officers, the Court [found] that this contact was not made with an intent to harm." *Id.* "Nor was this contact

accompanied by 'fury, vehemence, or outrage,' or the like." *Id.* As the Court explained, "[t]he throughline of the definitions of 'violence' is a degree of aggressiveness that [wa]s not present in th[at] case." *Id.* And, even though Mr. Yang was "near the front of the line opposing the line of officers," and twice made physical contact with officers, the Court concluded that "Yang did not act with the degree of aggression necessary to fairly characterize his actions as 'violence.'" *Id.*

Similarly, in *Orta*, the government conceded that the Yang standard was appropriate,[5] but argued 4C1.1 did not apply because of two incidents – one, his pushing of the metal bicycle barricade against officers and second, his subsequent throwing of a Go-Pro or body worn camera at officers. The Court ruled against the government and applied 4C1.1.

> You can have the intent to impede and get around, but not necessarily the intent to hurt. And I don't know if just the natural and probable consequence of pushing on a barricade could cause injury is enough, whether you have to show the specific intent, I think, here to injure. . . So I do think that . . . there's got to be more than just aggression. It's got to be aggression plus a specific intent to injure. . . . I don't know that simply saying that you're pushing against a barricade and that's a dangerous object that could injure is enough.[6]

And this was the finding despite the fact that the Court specifically found that in that case there was "great aggression, great fury, great outrage, great physical force,[7]" and a throwing of an object - none of which is present in this case.

---

[5] The Court referred to the definition of violence as "the use of physical force typically accompanied by fury, vehemence, or outrage and unlawfully exercised with the intent to harm, also defined as the exertion of any physical force so as to injure or abuse." The government conceded this definition was appropriate. See Exh. 2 at p. 7.

[6] Transcript at 34-36

[7] Id. at 37

The government in *Orta* in attempting to distinguish *Yang* emphasized that in *Yang* the confrontation took place as officers were trying to clear an area – exactly what happened here. In *Orta*, the government pointed to other aggressions by Mr. Orta (e.g., throwing of the metal barricades and aggressive language) as evidence of his intent to cause harm. There were no such other aggressions here. In fact, there was the opposite. Mr. Fuller attempted to remove the chance of violence by passing a weapon he found to the police and chastising a fellow rioter who suggested he should not have done so. The government also focused in on Orta's throwing of the body camera – something that is far more aggressive than what Mr. Fuller did.

In *Orta* the government said, "I can appreciate that if the officers are attempting to clear an area, that that is, you know, perhaps a different kind of contact."[8] That is the contact that happened in Mr. Fuller's case. Unlike in *Orta*, here the government's sole argument just that "he forcefully pushed his body against the line of officers protecting the Capitol building."[9] That is far less than they had in *Orta* and is not enough.

The requirement that the Government has conceded applies, requires a finding that Mr. Fuller intended to harm an officer. That is simply not the case here. The same reasoning as applied in *Yang* and *Orta* applies with even more force here. Mr. Orta threw an object at the police. Mr. Orta made aggressive comments.

---

[8] Orta Transcript at 8
[9] Govt. Sentencing Memo at 13.

And still, the Court found that he did not intend to harm the police and thus 4C1.1 applies. Mr. Fuller did neither. When viewing Mr. Fuller's individual conduct on January 6, he did not use "violence" as that term is properly understood. Mr. Fuller did not punch, kick, grab, or throw any objects at law enforcement officers. At no point did he damage property, threaten others, yell at anyone, or encourage others to use violence or even to push forward. Given the indisputable fact that Mr. Fuller did not engage in any acts of violence, the government appears to be advocating for a January 6th exception to the Guideline amendment. Had the Sentencing Commission wanted such an exception they could have written it in as this amendment was promulgated years after January 6, 2021. They did not.

The "physical contact" enhancement that Mr. Fuller agreed to in the plea agreement is far broader than § 4C1.1(a)(3): whereas § 2A2.4(b)(1) applies if "the *offense involved* physical contact," §4C1.1(a)(3)'s violence provision applies only if "*the defendant . . . use[d]* violence or credible threats of violence." The contrast between these provisions' subjects (*i.e.*, "defendant" versus "offense") and the operative verbs ("use" versus "involves" or "results") makes clear that the inquiry of § 4C1.1(a)(3) "turns on the actions of the defendant himself or herself," unlike § 2A2.4(b)(1) which theoretically can consider "the actions of others." *See Yang*, 2024 WL 519962, at *4 (D.D.C Feb. 9, 2024); *cf. United States v. Hernandez-Barajas*, 71 F.4th 1104, 1106-07 (8th Cir. 2023) (interpreting similarly-worded threats provision in U.S.S.G. § 2D1.1(b)(2) and concluding that the "sentence's subject, the doer of the action, is the defendant" and that "[g]rammatically speaking, the defendant is the

one who must make the credible threat, even if it involves the potential use of violence by someone else"); *see also* U.S.S.G. § 2J1.2(b)(2) (applying 3-point enhancement if "the *offense resulted* in substantial interference with the administration of justice"); *see also United States v. Hernandez*, No. 21-cr-455 (CKK), ECF No. 65 at 4 (D.D.C. Jan. 31, 2024) (finding an argument based on the "2J1.2(b)(1)(B) enhancement . . . not persuasive because it is not focused on Defendant's conduct, which is the relevant inquiry" under 4C1.1).

### B. Although the physical contact enhancement applies, it overstates Mr. Fuller's culpability

Pursuant to the plea agreement, Mr. Fuller has stipulated that a three-level increase for "physical contact" under USSG § 2A2.4 (b)(1) applies. However, counsel submits that a downward variance is appropriate on these facts because a three-level enhancement overstates Mr. Fuller's culpability.

As stated in the PSR and outlined previously in this memorandum, Mr. Fuller indeed resisted the line of officers as they moved forward with their shields. It's important to note that it was the officers who moved forward and not Mr. Fuller.  Of course, the officers had every right to push forward as they were attempting to clear the terrace of protestors, and Mr. Fuller most certainly should have backed up instead of deliberately remaining in their way. But Mr. Fuller made physical contact with the officers when he raised his arm up while being pushed. Yes, he likely leaned in and technically this could be considered "pushing" so is therefore not disputed. But he was not an aggressor and he was not an assailant. And despite what the government claims, he was not the initiator.

Furthermore, "physical contact" under 2A2.4 (b)(1)(A) can encompass a wide range of conduct. While no federal court has defined "physical contact" for purposes of 2A2.4 (b)(1)(A), the Seventh Circuit has explained that the meaning can "be derived by examining the law of battery." Battery is defined as "intentional and wrongful physical contact with a person." *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (enhancement properly applied where inmate threw a cup of urine in a prison guard's face) (internal citations omitted). The enhancement has been applied in contexts in which the defendant's contact with a victim was more aggravated than Mr. Fuller's. For example, the Ninth Circuit upheld the application of the enhancement where the defendant kicked the victim correctional officer, causing him to lose his balance and hit his head. *United States v. Hill*, 996 F.2d 1228 (9th Cir. 1993); s*ee also United States v. Martinez-Alvarez*, 422 Fed. Appx. 356 (5th Cir. 2011) (affirming application of physical contact and bodily injury enhancements where defendant was convicted of assault on an officer and the assault caused painful swelling and bruising to the officer's knee and arms.). Here, where Mr. Fuller made contact, but did not intentionally assault an officer, and did not injure an officer, the Court should vary downward because a three-level increase to the offense level overstates the nature of his conduct.

Should the Court apply the zero-point offender adjustment and a one-level variance because Mr. Fuller's physical contact was indirect or not injurious, the total offense level would be 8, yielding a guideline range of 0 to 6 months.

## V.    A Probationary Sentence with a period of home detention or community service will achieve deterrence while avoiding significant disruption and hardship to Mr. Fuller's family.

Mr. Fuller is the primary financial provider for his family.  If he is sentenced to even a short period of incarceration, he will be unable to earn a paycheck and his family will struggle tremendously. If he is sentenced to a lengthy period of incarceration, the family will very likely lose their home. The Fuller family's monthly expenses exceed $5,000, with a significant portion going toward their mortgage.  Emily, Mr. Fuller's wife, works part time as a server earning around $800 per month.  The restaurant where she works has recently changed ownership and her position is no longer guaranteed. Even if Emily were to secure new employment, she lacks the skills and experience required to find a job that could cover their monthly expenses.  Moreover, Emily would not be able to work full-time without hiring childcare, an expense that would likely deplete or outweigh any potential earnings.

The government implies that Mr. Fuller is a man of substantial wealth, citing that he owns multiple vehicles and has a 401k account with over $20,000. Perhaps this would be a considerable cushion for a very small family, but that is not the case here. The family owns two cars which are necessary to get Mr. Fuller to his job and his children to their activities. One of those vehicles has over 220,000 miles and will of course need to be replaced soon. Mr. Fuller does own a motorcycle, though he rarely uses it and plans to sell it when it's time to replace the family car and/or to cover expenses. With regard to his 401k account (and regardless of the sentence imposed), Mr. Fuller's retirement will not be used to provide a luxurious retirement

for himself and Emily – they will be using any and all of their savings to send as many children as possible to college or trade school. But if Mr. Fuller is incarcerated, Emily would be forced to cash out the 401k (which would be decreased after paying early withdrawal penalties) and attempt to make it last for as long as possible… which would realistically only be a few months. After that, she'd be forced to sell off the assets, including the home, and then attempt the difficult (if not impossible) task of finding a property owner willing to rent to a mother of six with minimal income and an incarcerated felon husband… yet the government falsely suggests that a sentence of 11 months incarceration would somehow not leave his family bereft.

Aside from being the sole financial provider, Mr. Fuller plays an essential role in supporting Emily with child-rearing and parenting duties.  Surely the absence of a parent causes significant disruption in almost any family situation, but with six school aged children the circumstances here are unique.  Nicholas and Emily work together systematically to share or divide duties… everything from cooking, grocery shopping, helping with homework, and driving the children to activities and appointments.  Aside from school, the six Fuller children are collectively involved in drama, choir, FFA, football, wrestling, track, and cheerleading. Each of these activities requires transportation. To think that one parent could do this alone is simply not realistic.  Mr. Fuller's parents are not physically well enough to pitch in with childcare; and Emily's parents live over an hour away.  In short, a sentence of incarceration for Mr. Fuller would present the

greatest hardship and punishment to his wife - who is innocent. It is not lost on Mr. Fuller that his own actions are to blame - he takes responsibility for this and only asks the Court to consider the ripple effects that even a short period of incarceration could have on his family. Mr. Fuller's past imprisonment turned his life around for the better. A second imprisonment now would have the opposite effect. It would unravel his life and undo all the progress he has made.

Mr. Fuller has indeed already begun to face consequences for his actions. After dedicating 20 years to turning his life around, staying on the right path, and committing to his faith and family, he was devastated to be arrested for a federal crime. The anxiety over the prospect of his wife and children suffering for his mistakes is more than sufficient to deter him from ever again having a lapse of judgment like he had on January 6th. Furthermore, Mr. Fuller has stepped away from following political news and has no desire to ever participate in any type of rally or protest again. It's safe to say that January 6th, 2021, was his first and last protest.

With respect to general deterrence, the government's widespread prosecution of nearly everyone who entered Capitol grounds should serve as a deterrent to others in future elections. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[10] In short,

---

[10] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 28 (2006), available at https://scholarship.law.umn.edu/faculty_articles/495 .

the most effective deterrent is the certainty of punishment, rather than its length.[11] One would certainly hope and expect that general deterrence has been met by the government's dogged pursuit of everyone who participated in the January 6th insurrection.

## VI.    A Below Guidelines Sentence would avoid Unwarranted Disparities

The guidelines are not mandatory and can lead to a sentence that is greater than necessary to accomplish the goals of sentencing. In this case, a sentence below the guidelines would accomplish those goals and would not lead to disparity. While no two cases present the same combination of bad acts and mitigating factors, a comparison of Mr. Fuller's participation and circumstances supports a lower sentence.

First, there have been several cases that involved the same charge of a violation of Civil Disorder that resulted in a non-custodial sentence or a sentence of intermittent confinement. The defense submits that Mr. Fuller's actions were less egregious than all of these individuals:

_United States v. Benjamin Cole (23-cr-113-TNM):_

Benjamin Cole, a member of the Guardians of Freedom, joined in the lower west terrace "tunnel fight" by pushing against other protestors. Cole wore a tactical vest and carried a black expandable metal baton. Mr. Cole joined protestors in

---

[11] 4 See, e.g., The Growth of Incarceration in the United States 131 (Jeremy Travis et al. eds., 2014); Five Things About Deterrence, Nat'l Inst. of Just., https://nij.ojp.gov/topics/articles/five-things-about-deterrence

attempting to forcefully push through the police line at the tunnel entrance to the Capitol. After January 6, Cole posted messages to his Facebook calling the FBI a "joke" and claiming that he did "absolutely nothing" at the Capitol. The first time he was interviewed by the FBI, he denied coming near the Capitol.[12] For all of this, Cole was sentenced to 14 days of intermittent confinement.

### United States v. Timothy Hart (21-cr-540-PLF)

Defendant Hart was convicted of Civil Disorder for joining rioters to overrun barriers manned by police in the very first early breach of the Capitol grounds. He then ignored the pepper spray around him and made his way into the building, where he remained for 22 minutes. While inside the Capitol, he smoked marijuana in the Rotunda.[13] The district judge imposed a sentence of 36 months probation notwithstanding the government's request for four months incarceration.

### United States v. Brian Preller (23-cr-45-TNM):

Defendant Preller, a member of the "Guardians of Freedom," an organization loosely affiliated with the Three Percenters, entered the Lower West Terrace "tunnel," where he confronted police officers and pushed against others pushing against the police line. Preller wore large googles, a helmet, and a tactical vest that carried what appeared to be a chemical irritant spray in the front. Following January 6, Preller posted several statements taking credit for January 6, 2021. For example, when someone asked him what he had been doing, he responded,

---

[12] Government Sentencing Memorandum, ECF 86
[13] Government Sentencing Memorandum, ECF 69

"continuing to build my 3% army so I can overthrow the federal government."[14] The district judge rejected the government's request for eight months incarceration and instead imposed a sentence of 60 months' probation.

## United States v. Richard Zachary Ackerman  (24-cr-60-TJK):

According to the government, Richard Ackerman stole a U.S. Capitol Police Officer's helmet and wore the helmet throughout his time on Capitol grounds, including when he threw a water bottle at officers engaged in intense fighting with rioters on the Lower West Terrace. He then bragged about his actions in text messages sent to multiple people and referred to the stolen helmet as his "war trophy."[15] Ackerman pleaded guilty to Civil Disorder (231) and Theft of Government Property (641). The government sought the 3 level enhancement for physical contact. Ackerman's sentencing guideline range was 10-16 months imprisonment. He was sentenced to time served (which was two days) and 24 months probation, not withstanding the government's request for 10 months incarceration.

## United States v. Matthew Council (21-cr-207-TNM):

Council confronted law enforcement on the west front, then entered the Capitol building through the Parliament door and assaulted officers by lowering his head, sticking out his arms and ramming into a line of police officers, pushing them back.[16] He then falsely portrayed his own actions and the actions of those around him when interviewed by law enforcement. (He was one of few people arrested that

---

[14] Government Sentencing Memorandum, ECF 90
[15] Government Sentencing Memorandum, ECF 34
[16] Government Sentencing Memorandum, ECF 64

same day). Ultimately, he pleaded guilty to all charges, including assault and civil disorder, without entering into a plea agreement. Long after the charges were brought, he continued to espouse conspiracy theories and held himself out as a political prisoner. The government requested 30 months incarceration and Mr. Council was sentenced to 60 months probation.[17] It appears from the defendant's sentencing memorandum that the significant variance was likely for mental health reasons or because of perceived differences in the prosecution of these protests and others, although Counsel does not have access to the transcript.[18]

*United States v. Victoria White (21-cr-563-JDB):*

Victoria White pleaded guilty to Civil Disorder. After observing the violence at the tunnel, White joined in by first hoisting up another rioter so he could hang from the archway and kick at the officers, and then moving to the front of the police line where she acted disorderly enough that officers took her into custody on the spot. Almost immediately after her release, she took to social media to brag about her participation as well as blamed police for using force against rioters. According to the government, she expressed no remorse leading up to sentencing.[19]  White was sentenced to 24 months of probation including 8 days intermittent confinement and three months home detention, notwithstanding the government's recommendation of four months incarceration.

*United States v. Tyng Yang (23-cr-100-JDB):*

---

[17] Judgement, ECF 75
[18] Defendant's Sentencing Memorandum, ECF 66
[19] Government Sentencing Memorandum, ECF 89

Tyng Yang's actions are previously outlined in this memorandum regarding the 4C.1.1. Yang had physical contact with officers twice, including forcefully grabbing an officer's wrist. He also remained inside the building for 30 minutes.[20] Yang's guideline range was the same as Mr. Fuller's. He was sentenced to 24 months probation including 6 days intermittent confinement, notwithstanding the government request for 11 months incarceration.

Other Civil Disorder cases demonstrate a similar pattern of sentences well below the government's ask:

_United States v. James Russell Davis (21-cr-595-TJK):_

Defendant James Davis pleaded guilty to Civil Disorder.  However, Davis's conduct was far more severe than Mr. Fuller's in the following ways: Davis arrived early to capitol grounds and witnessed and participated in violence of the west front which led to police retreat. He initiated physical contact with law enforcement and did so multiple times and with multiple officers; Davis carried a large wooden stick (which also made contact with at least one officer); and he verbally harassed multiple officers. But perhaps most notably different from Mr. Fuller, Davis was a member of the Proud Boys, and prior to January 6th he posted messages to other members encouraging them to "prepare for battle," as well as encouraged violence against law enforcement, and finally called for violence at the rally by posting, "LET THE BODIES HIT THE FLOOR." While still on Capitol grounds, Davis posted

---

[20] Government Sentencing Memorandum, ECF 34

about his actions within his Proud Boys chat group, bragging that he used his stick to force police to retreat.[21] Similar to Mr. Fuller, Davis's calculated offense level was 11 with a sentencing guideline range of 8 to 14 months' imprisonment. This included a 10pt base level offense plus an additional 3pts (minus 2pts for acceptance of responsibility). However, Davis's 3pt. enhancement was "Physical Contact or Dangerous Weapon Used," even though Davis engaged in both direct physical contact using his hands *and* physical contact using a dangerous weapon. James Russell Davis was sentenced to two months incarceration, notwithstanding the government's recommendation of eight months.

*United States v. Bernard Sirr (22-cr-259-TNM-1); United States v. Luke Lints (22-cr-259-TNM-2):*

Bernard Sirr and Luke Lints are examples of individuals with cases similarly situated to Mr. Fuller. Each had an identical 8 to 14-months agreed-to Guideline range following their pleas to Civil Disorder. Each received sentences well below that range. But the actions of both defendants were more egregious than that of Mr. Fuller. For example, Sirr was a member of his local Proud Boys chapter who drove to Washington D.C. with his fellow extremists. Prior to January 6th, Sirr posted several threatening tweets alluding to violence against members of the government, and on January 6th, he was at the front of the group of rioters in the tunnel pushing against police officers who were guarding the Capitol. Sirr was eventually repelled; however, he remained on the grounds and videoed the attack on an officer before

---

[21] Government Sentencing Memorandum, ECF 52

attempting to enter the tunnel for the second time. Sirr admitted to the FBI that he attended the rally and tried to enter the Capitol, but lied about his intentions that day and fabricated his reasoning for attempting to enter the tunnel a second time.[22] Sirr was sentenced to two months of incarceration and 12 months of supervised release notwithstanding the government recommendation of 10 months incarceration.

Lints attended the "Stop the Steal" Rally with his mother, after which the two made their way to the Capitol. On the way, Lints's mother fell ill and was taken to the hospital via ambulance. Instead of accompanying his mother to the hospital, Lints continued his march on the Capitol, entered the restricted grounds and made his way onto the Lower West Terrace. Lints was in the same tunnel as Sirr and similarly made his way to the front of the rioters. There, Lints stole a police shield from officers and proceeded to use it in a coordinated push against the officers. He stole a second and third shield, and continued to use police gear against the officers until he was forced from the tunnel. After January 6th, Lints was unremorseful, posting falsehoods on social media, minimizing his conduct, and calling the police the aggressors.[23] The government also sought 10 months incarceration for Lints. He was sentenced to 4 months of incarceration, 4 months of home detention, followed by 36 months of supervised release.

_United States v. Stephanie Hazelton (21-cr-00030-JDB):_

---

[22] Government Sentencing Memorandum, ECF 53
[23] Government Sentencing Memorandum, ECF 58

Stephanie Hazelton entered the Lower West Terrace Tunnel three times, all the while leading and urging other rioters forward and pushing forward against police officers. Hazelton pushed towards the front of the crowd and confronted the officers as they were assaulted with poles and batons. She was one of the first groups to enter the tunnel, and she urged others forward and called for more men to join the push. In the days following January 6, Hazelton took to Facebook Messenger to boast about her conduct at the Capitol and state her intent to do it again. In subsequent messages, she told of erasing content of the events from her phone.[24] Hazelton had an identical 8 to 14-months Guideline range following her plea to Civil Disorder. She was sentenced to 10 days of incarceration and 24 months of supervised release notwithstanding the government's recommendation of 11 months incarceration.

*United States v. Anthony Nolf (23-cr-162-BAH):*

Defendant Anthony Nolf pleaded guilty to Civil Disorder and had the same guideline range as Mr. Fuller which included a three-level enhancement.  Nolf arrived early to Capitol grounds and moved barricades off to the side and then had indirect physical contact with officers in the tunnel fight.  Nolf brought his 15-year-old son into the tunnel with him, and then only left the area when protestors were forcefully pushed out by law enforcement after 5pm. He later lied to the FBI about his conduct and was initially not remorseful.[25]  He was sentenced to three months

---

[24] Government Sentencing Memorandum, ECF 56
[25] Government Sentencing Memorandum, ECF 63

incarceration followed by 36 months probation notwithstanding the government recommendation of 11 months incarceration.

_United States v. Daryl Johnson (21-cr-407-DLF-1);_ and _United States v. Daniel Johnson (21-cr-407-DLF-2):_

According to the government, Daryl and Daniel Johnson climbed into the Capitol through a broken window and remained inside the building for 26 minutes. While inside, they joined a group of rioters in rushing and shoving aside several U.S. Capitol Police offers who were guarding the East Rotunda doors from a mass of additional rioters gathered outside. They then joined others to push against the police line, sandwiching the officers against the doors. The day after January 6th, Daryl Johnson posted on Facebook, "… Mark my words Yesterday will be the beginning of the revolution… what happens when those same people decide to throw out the 'elected officials.' It will be hangings on the front lawn of the Capitol – that crowd is not messing around."  On February 7th, he posted, "Bring it on Biden! I have no problem dying in a pool of empty shell casing."  Daniel Johnson also bragged about his actions on social media, and in a Snapchat conversation admitted that he was trying to find a way into the Senate chamber.[26]  Both defendants pleaded guilty to Civil Disorder, but neither were given the three-level physical contact enhancement despite the fact that they, like Mr. Fuller, indirectly pushed officers. Daryl Johnson, with no significant criminal history, was sentenced to 30 days incarceration followed by 12 months probation (government recommended 90

---

[26] Government Sentencing Memorandums, ECF 57 and ECF 58

days); and Daniel Johnson, a criminal history category II, was sentenced to four months incarceration followed by 12 months probation (government recommended 4 months). These sentences were both imposed prior to the new 4C1.1 guideline.

*United States v. Paul Orta, 24-cr-146* (DLF):

This case was described at length above in the discussion regarding 4C1.1. Despite more egregious conduct and no familial obligations, Mr. Orta was sentenced to 6 months of incarceration. Because Mr. Fuller has significantly different and more compelling family obligations and engaged in less aggressive actions, a lesser sentence would be appropriate.

With respect to Civil Disorder sentences imposed by this Court specifically, there is only one case to draw from in which the individual was not also convicted on additional more serious charges such as assault.[27]  Like the previous cases cited, the circumstance of this case differ from Mr. Fuller's, but the comparison should at the very least emphasize that the government's recommendation of 11 months incarceration is far too high:

*United States v. Jerry Ryals (21-cr-244-CKK):*

According to the government, "… on his way up the stairs of the Capitol to break inside, Ryals clearly observed the Capitol Police officers attempting to defend

---

[27] According to the Government sentencing chart, last updated on Oct. 7, 2024 (District of Columbia | Capitol Breach Cases | United States Department of Justice), this court has sentenced the following individuals on the Civil Disorder charge: Christopher Grider (21-cr-22-CKK) on eight additional counts; Salvador Sandoval (21-cr-195-CKK) on eight additional counts including assault; Kevin Galetto (21-cr-517-CKK) on Civil Disorder and Assault; and Jerry Ryals (21-cr-244-CKK) on Civil Disorder only.

the building, and created a video with his cell phone in which he stated: 'They are tear gassing, throwing flash bangs, pepper spray, but we will not concede.'; near the top of the stairs outside of the Capitol, after police officers had been overrun and people began breaking inside of the Capitol, Ryals filmed another cell phone video, this time stating: 'We definitely have enough people to overthrow this bitch. They don't stand a fucking chance. We got the fucking doors open up there, I guess. We're working our way in slowly but surely.'; Ryals illegally entered through a side door and approached a locked office door just inside the entrance; after observing that the office door was locked, Ryals attempted to break down the door using his shoulder, and was then joined by other rioters who broke through the door; Ryals, after remaining in the office for approximately 10 minutes, was forced out of the Capitol by police, but shortly thereafter reentered the Capitol where he remained for 30 minutes walking to several locations, including the Rotunda and the Crypt; the next day, on January 7, Ryals posted a statement on Facebook, calling himself a "patriot" and stating that the country was headed for war."[28]  Mr. Ryals did not accept responsibility early on but did ultimately plead guilty.  This Court sentenced Mr. Ryals to 9 months incarceration, in part because in his post plea debriefing, Mr. Ryals was not truthful and forthcoming. The opposite is true with respect to Mr. Fuller. He was fully forthcoming and truthful in his post-plea debriefing as he has been throughout this prosecution.

---

[28] Government Sentencing Memorandum, ECF 73

The defense has not included misdemeanor cases as comparisons because Mr. Fuller's offense falls under a felony charge. But surely this Court is aware that plenty of January 6th misdemeanants conducted themselves with greater sense of hostility and vengeance than Mr. Fuller, and many of them had malevolent motives beyond what they were able to achieve. Nevertheless, sentencing guidelines do not apply to misdemeanants and they are therefore often sentenced to only probation. And aside from conduct on the day, the same comparison holds true for Mr. Fuller's actions both before and after January 6th, which is important. At the time of filing this memorandum, the upcoming U.S. Presidential election is already contentious with a very real possibility that the outcome will once again be challenged, and Courts must consider if a defendant is inclined to repeat offenses in the name of politics should another lawless event occur. Many other January 6th defendants, including misdemeanants, have engaged in dangerous rhetoric, even after January 6th, often spreading misinformation or spinning false narratives online, and some of them calling for continued violence or even Civil war. Mr. Fuller simply never did anything of the sort.

When Mr. Fuller is before this Court for sentencing, the election will have occurred. Regardless of which candidate is the new president-elect, Mr. Fuller will not be inserting himself into politics, attending any protests, or joining any movements. Instead, he will use the opportunity to set a good example for his children by handling himself with grace and lawfulness. A prison sentence will not be required to achieve that.

## VII.   Mr. Fuller's actions are not comparable to those of the defendants who received substantial sentences of incarceration.

The government has pointed to cases where more substantial periods of incarceration have been imposed. The defense submits that those cases are not comparable examples:

*United Staes v. Roger Baugh (22-cr-313-JEB):*

Baugh participated in the "tunnel fight" during some of the most violent incidents.  Unlike Mr. Fuller who resisted officers, Baugh was an aggressor and acted with the intent of breaking the police line so that he could enter the Capitol. This in itself would be enough to differentiate Mr. Fuller from this defendant, but Baugh's actions otherwise were so far beyond the scope of anything that Mr. Fuller did, the use of this case as something even remotely comparable is not warranted. For example, Baugh traveled to the Capitol (and entered capitol grounds) with his co-defendant whom he knew was armed with loaded handguns. After January 6th, Baugh filed a fake police report claiming that his car was stolen in an attempt to aid that co-defendant who had lost one of his guns at the capitol (apparently, they had planned to say that the gun had been in the "stolen car").  Baugh later lied to the FBI, denying that his co-defendant had stolen a police baton.

*United States v. Ronnie Presley (21-cr-257-RDM):*

Ronnie Presley pleaded guilty to Civil Disorder and was sentenced to 12 months incarceration. He entered the US Capitol and resisted the efforts of law enforcement to remove the crowd.  If this is all Presley had done, perhaps his actions could be

somewhat comparable to Mr. Fuller's.  But there is far more to the story. Firstly, when officers tried to push him back, Presley resisted by also moving forward toward them.  One officer pushed Presley a total of seven times because, "after each push, Presley continued to move toward the officer." Even after that, Presley continued to move forward, forcing an officer to deploy his baton to push him away. He was finally moved out of the Rotunda after law enforcement used chemical irritant against him. After Presley was outside the building, he aggressively attempted to re-enter by forcefully grabbing the shield of an officer who was guarding the door, an offense that has resulted in assault charges for other January 6th defendants. And if that all weren't enough to discredit this case as a comparator, Ronnie Presley committed all these offenses at the US Capitol while still on Probation for a 2019 assault conviction.

*United States v. David Blair (21-cr-186-CRC):*

David Blair pleaded guilty to Civil Disorder and was sentenced to 5 months incarceration.  Blair's case is a far more fitting comparison than the other examples the government has cited, because like Mr. Fuller, Blair committed his offense while resisting officer's attempts to clear capitol grounds. As outlined previously in this memorandum, those circumstances are rather unique because the majority of January 6th defendants acted with the intent to "push forward" rather than simply resist being pushed out.  However, during his resist of the officers and after intentionally drawing an officer to use his baton to push him, Blair verbally taunted law enforcement by shouting, "What's up motherfucker, what's up bitch?" Seconds

later, when officers continued advancing, Blair (who had brought a lacrosse stick to the Capitol, despite not having any apparent need for sporting equipment) pushed his lacrosse stick into a police officer's chest and was then detained and arrested on the spot. Police found a knife and a roll of duct tape in his backpack. Blair was later charged with three felonies (Civil Disorder, Assault with a deadly and dangerous weapon, and Obstruction) as well as misdemeanors. He was allowed to plead guilty to only Civil Disorder. When interviewed by the FBI, Blair lied and blamed his actions on the police, falsely claiming that an officer had pushed him from behind which angered him and led him to "cross check" another officer with his stick. The government argues that Mr. Fuller deserves a six-months longer incarceration sentence than Blair because Blair only had "one forceful push against the police lasting only a few seconds."  They further argue that Mr. Fuller "pushed against police using his body weight twice and for well over a minute the second time."  To that, the defense directs the Court to the detailed description previously outlined in this memorandum which explains the circumstances that mitigate this overstatement as well as reiterates that Mr. Fuller never used disrespectful language while addressing police, and rather than bringing a makeshift weapon to the capitol he assisted officers by removing one from the crowd. The defense invites the Court to use the government's example of David Blair and his five-month sentence as an absolute upper limit comparison.

## VIII.  Conclusion

For the reasons stated above and given the unique circumstances of his actions at the capitol and his role as a non-aggressor, counsel recommends a significant downward variance from the sentencing guidelines. And given his family situation, his contrition, his cooperation, and his history and characteristics, counsel recommends that a sentence that is sufficient and not more than necessary is one that avoids interruption to Mr. Fuller's critical contribution to his dependents. Mr. Fuller respectfully requests that the Court impose a period of probation with any additional conditions deemed appropriate, along with the $2,000 restitution. As noted above, this request for a non-custodial sentence is consistent with the recommendation of the United States Probation Office:

> *"The conduct in this case is serious, and the Probation Office believes that a sentence of 36 months' probation would be appropriate, with the added component of home detention. If the court is inclined to impose a period of incarceration, the Probation office would respectfully recommend a consideration for intermittent incarceration as a secondary option, which would allow him to maintain his job and household.*
>
> *The recommended special conditions referenced within the presentence report are supported by the defendant's characteristics and personal history. The recommended sentence is sufficient, but not greater than necessary to reflect the seriousness of the offense, provide general deterrence, and to promote respect for the law, as well as to protect the public from further crimes of the defendant. Based on the defendant's financial situation and need to support his family, the imposition of a fine is not recommended in addition to restitution."*

<div style="margin-left: 40%">

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
MICHELLE M. PETERSON
Chief Assistant Federal Public Defender

</div>

625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Shelli_Peterson@fd.org